J-S39044-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.J.V.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1912 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9027

| | | |
|---|---|---|
| IN RE: J.J.V.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1913 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9027

| | | |
|---|---|---|
| IN RE: T.J.A.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1914 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9028

IN RE: T.J.A.K.-L., A MINOR      :     IN THE SUPERIOR COURT OF
                         :            PENNSYLVANIA
                         :

APPEAL OF: BCC&YSSA         :
                         :
                         :
                         :
                         :
                         :
                         :     No. 1915 EDA 2025

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9028

IN RE: J.L.S.K.-L., A MINOR      :     IN THE SUPERIOR COURT OF
                         :            PENNSYLVANIA
                         :

APPEAL OF: BCC&YSSA         :
                         :
                         :
                         :
                         :
                         :
                         :     No. 1916 EDA 2025

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9029

IN RE: J.L.S..K.-L., A MINOR      :     IN THE SUPERIOR COURT OF
                         :            PENNSYLVANIA
                         :

APPEAL OF: BCC&YSSA         :
                         :
                         :
                         :
                         :
                         :
                         :     No. 1917 EDA 2025

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9029

J-S39044-25

| IN RE: J.J.A.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1918 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9030

| IN RE: J.J.A.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1919 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9030

| IN RE: J.T.S.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1920 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9031

- 3 -

J-S39044-25

| | | |
|---|---|---|
| IN RE: J.T.S.K.-L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1921 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9031

| | | |
|---|---|---|
| IN RE: Y.A.B.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1922 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9071

| | | |
|---|---|---|
| IN RE: Y.A.B.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: BCC&YSSA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1923 EDA 2025 |

Appeal from the Decree Entered June 30, 2025
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2024-A9071

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                **FILED JANUARY 12, 2026**

- 4 -

The Bucks County Children and Youth Social Services Agency (hereinafter, "CYS" or "the Agency") appeals the June 30, 2025, decrees that denied its petitions to involuntary terminate the parental rights of J.E.L. a/k/a J.L. ("Father") and A.M.K. a/k/a/ A.K. ("Mother") (collectively, "Parents") with respect to their six biological children (collectively, "the Children").[1]  After careful review, we conclude the trial court committed an error of law in evaluating whether CYS established grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(8) ("subsection (a)(8)") because the trial court employing criteria relevant only to 23 Pa.C.S.A. § 2511(a)(5) ("subsection (a)(5)") to make its subsection (a)(8) determination.  *See In re Adoption of G.W.*, 342 A.3d 68 (Pa. Super. 2025) (*en banc*).  We therefore vacate the underlying decrees and remand for the trial court to promptly conduct a separate and comprehensive legal analysis applying the legal standards that apply to subsection (a)(8) to the evidence and, if it concludes that grounds for termination do exist under subsection (a)(8) to conduct a legal analysis under 23 Pa.C.S.A. § 2511(b).

We gather the relevant factual and procedural history of these matters from the certified records.  Parents are not married but were in a long-term

_____

[1] The children are:  T.J.A.K.-L. ("T.J.A."), a son born in March 2017; J.J.A.K.-L. ("J.J.A."), a son born in May 2018;  J.L.S.L.K.-L. ("J.L.S.L."), a daughter born in October 2019; J.T.S.K.-L. ("J.T.S."), a son born in December 2020; J.J.V.K.-L. ("J.J.V."), a daughter born April 2022; and Y.A.B.K. ("Y.A.B.K."), a son born in May 2023.

relationship that began in 2017 and resulted in the births of the Children. The Agency has a significant history of involvement with this family that included at least nine separate ChildLine reports between approximately 2018 and 2022 concerning Parents' care of the Children. *See* N.T., 1/15/25, at 7-17; *see also* CYS Exhibit 16 at 6. One of the first referrals the Agency received alleged Parents were feeding inappropriate substances, such as Vicks Vapo Rub, to the Children. *See* CYS Exhibit 16 at 6.

These initial reports also highlighted concerns regarding Parents' mental health: Father was hospitalized for suicidal ideation in 2018, and in 2021, Mother attempted to commit suicide with alcohol while she was pregnant with J.J.V., which also led to her hospitalization. *See* CYS Exhibit 12 at 6, 9; *see also* N.T., 2/21/25, at 220-21; N.T., 3/17/25, at 115-18. During this incident, Mother exclaimed that she "wanted to go to heaven and wanted to take her children with her." CYS Exhibit 18 at 3. These early referrals also related to recurrent problems with mold, "roaches[,] and the sewage system" in the family's home. CYS Exhibit 12 at 6.

The concerns for the Children culminated in a Child Protective Services ("CPS") report the Agency received in September 2022. As Jenna Moher ("Ms. Moher"), a CYS intake worker, later testified, J.J.V. was admitted to St. Christopher's Hospital for Children ("SCHC") in a "near fatality" incident resulting from burns she suffered to her "face, chest and esophagus" while in Parents' care. N.T., 11/12/24, at 13-16; CYS Exhibit 3 at 8; CYS Exhibit 8 at

1-13. When questioned in September 2022 by CYS and hospital personnel, Mother claimed that J.J.V.'s injuries were caused by her feeding the child a bottle of formula that was "too hot" after being warmed in a microwave. N.T., 11/12/24, at 22; CYS Exhibit 8 at 1-4. However, SCHC records indicate Mother reported only that J.J.V. was suffering "nasal congestion" and did not mention the burns until hospital staff discovered them. CYS Exhibit 8 at 1-13; *see also* N.T., 11/12/24, at 46-48.

In October 2022, the hospital determined J.J.V.'s injuries were consistent with her having ingested an unknown "caustic substance." CYS Exhibit 15 at 57. Specifically, physicians determined that "the finding seen on [the] tracheotomy are consistent with a caustic injury, and not just a thermal burn as previously reported, as caustic injury causes scarring over a course of time, and a thermal injury would not cause scarring as severe as is seen [in J.J.V."] *Id*. The records further indicate concern over the implications of these findings, particularly with respect to Mother:

> These concerns of a caustic injury would not be consistent solely with a thermal burn as previously reported by [M]other, and the causal mechanism for the injuries seen remains unclear. Given [J.J.V.'s] age and limited developmental abilities, she would have been unable to ingest a caustic substance on her own. In the absence of an appropriate accidental history, this evaluation remains concerning for inflicted injury.

*Id*. These medical findings were also shared with CYS representatives. *Id*.

On September 16, 2022, Ms. Moher visited Parents' residence in Levittown, Pennsylvania, to conduct a home visit in connection with the CPS

referral. *See* N.T., 11/12/24, at 26-27. CYS found the home to be in a deplorable condition, with an active roach infestation and "minimal furniture" and not "enough beds for everybody who was allegedly living there." *Id*. at 27-28. CYS learned that the parties' children were living with their maternal grandmother ("Maternal Grandmother"). *See id*. at 31-32. When contacted regarding a home visit, Maternal Grandmother declined to allow CYS access to her home. *See id*.

That day, CYS sought and was granted emergency protective custody of T.J.A., J.J.A., J.L.S., J.T.S., and J.J.V. *See id*. at 33-34. In September 2022, the juvenile court confirmed this order at a shelter care hearing. *See id*. at 34.[2] Later that month, the court adjudicated T.J.A., J.J.A., J.L.S., J.T.S., and J.J.V. dependent. *See id*. at 135; N.T., 11/15/24, at 4. Contemporaneously, the court established their primary permanency goals as reunification with concurrent goals of adoption. *See id*. Around this time, it appears Parents ceased living together.

In October 2022, the CPS investigation determined that Mother was "indicated" as having harmed J.J.V. N.T., 1/15/25, at 44-45. Mother was criminally charged with endangering the welfare of a child and simple assault,

_____

[2]Upon review of the record there is nothing in the record to reflect what exact conditions formed the bases for removal, and the dependency record was not made a part of the certified record.

although the charges were withdrawn without prejudice in November 2023. *See id*. at 7-8, 11.[3]

J.J.V. remained at SCHC from September 2022 until February 2023, when she was transferred to Weisman Children's Rehabilitation Hospital ("Weisman"); she later received treatment at Hershey Medical Center ("Hershey"). The records from Hershey similarly identify J.J.V.'s injuries as being the result of a "nonaccidental" caustic ingestion. *See* Exhibit 16 at 618-19, 647, 654, 837, 966, 1148. J.J.V. underwent a tracheotomy due to the severity of the scarring to her esophagus and now receives nutrition through a feeding tube. She has also had to endure serial surgical procedures.

During her hospitalization, J.J.V. went into cardiac arrest after her tracheotomy tube became occluded. *See* CYS Exhibit 18 at 2. As a result, J.J.V. must be monitored at all hours of the day to ensure that her airway remains unobstructed. *See* N.T., 11/15/24, at 113. In June 2023, she was placed into a foster home in the care of J.C. and L.C. *See id.* at 55. J.C. is a nurse who has specialized training to care for children with tracheotomies. *See* N.T., 1/15/25, at 163.

T.J.A., J.J.A., and J.T.S. were initially placed in the care of their maternal aunt, V.H. ("Maternal Aunt"), until they were removed in April 2023 due to the Agency's concerns about Maternal Aunt's ability to protect them. *See*

_____

[3] Father was not directly implicated as a perpetrator of J.J.V.'s injuries.

N.T., 11/15/24, at 45-46. Thereafter, they were placed together in a series of foster homes. *See id*. at 49-52. At the time of the termination hearings, the three older boys had been in the care of their current foster parents, J.S. and D.K., for approximately one year. *See id*. at 52, 162. Like her brothers, J.L.S. was also placed into a series of foster homes. Since December 2023, she has been in the care of L.C. and J.C., along with J.J.V. *See id*. at 54.

Y.A.B.K. was born in May 2023. The Agency immediately sought, and was granted, emergency protective custody of him. *See* N.T., 11/12/24, at 140. On June 14, 2023, Y.A.B.K. was adjudicated dependent with the same permanency goals as his siblings. *See id*. at 143; *see also* N.T., 11/15/24, at 4. The same month, the court entered an aggravated circumstances order in Y.A.B.K.'s case relieving the Agency of making any efforts towards reunifying him with Mother.[4] *See* CYS Exhibit 20 at 1-2 (unnumbered).

Y.A.B.K. was initially placed in a foster home. *See* N.T., 11/12/24, at 140-41. In February 2024, he was transferred to the kinship care of paternal aunt and her wife over the Agency's objections. *See id*. In April 2024, CYS discovered that Y.A.B.K. had fractured both of his tibias on two separate occasions after being transferred to kinship care. *See id*. at 142-43; N.T.,

_____

[4] Although a similar order with respect to J.J.V. is not present in the certified record, the transcripts of testimony suggest that a similar aggravated circumstances order was entered in her case. *See* N.T., 11/12/24, at 179.

11/15/24, at 106-07. Y.A.B.K. was returned to his original foster home and has remained there. *See* N.T., 11/12/24, at 143-44.

All of the Children's respective foster placements are pre-adoptive homes. *See* N.T., 1/15/25, at 93. Although the Children live in three separate homes, they maintain contact with one another through Facetime, occasional in-person visits, and an ongoing "group chat." *Id*. at 147.

In connection with the Children's dependency cases, the Agency created family service plans for Parents, which are "road maps" explaining the objectives parents must meet to remedy the circumstances that bring children into the custody of CYS so that reunification can occur." *Id*. at 145. These objectives required Parents to: (1) address their respective mental health needs; (2) provide and maintain a "safe living environment free of health and safety hazards;" (3) "prevent further abuse or neglect" of the Children; and (4) each complete a parental capacity evaluation and follow the resulting recommendations. *Id*. at 149, 186-87; *see also generally* CYS Exhibit 9-10. These objectives have remained the same throughout the case.

Father's parenting capacity evaluation was performed in March 2023 by Bradley R. Beckwith, Psy.D., LPC ("Dr. Beckwith"), who expressed particular concern Father "lacks the appropriate skills necessary to protect" the Children. CYS Exhibit 12 at 10. To that end, Dr. Beckwith concluded that Father "needs to develop adaptive skills for parenting and protecting [the Children] from adverse experiences[.]" *Id*. Dr. Beckwith also noted that Father's "mental

health remains one of the most significant factors in his parenting and overall stability." *Id*.

Mother's evaluation was conducted in April 2023 by Veronique Nicole Valliere, Psy.D. ("Dr. Valliere"). *See* CYS Exhibits 12, 18. Dr. Valliere's assessment noted that Mother suffered from major depressive disorder, posttraumatic stress disorder ("PTSD"), and anxiety disorder, conditions Mother denied or minimized. *See* CYS Exhibit 18 at 4. Dr. Valliere found Mother's overall presentation unempathetic, "highly egocentric," "superficial," and "unrealistically positive, showing no distress, concern, or discomfort with her situation." *Id*. at 5-8. Along similar lines, Dr. Valliere noted Mother's "inability to accept, understand, or acknowledge the severity" of J.J.V.'s injuries. *Id*. at 5. Although Mother acknowledged the medical findings J.J.V.'s injuries were caused by a caustic substance and were not merely the result of an overheated bottle, Dr. Valliere reported that Mother could not offer a reasonable explanation for these circumstances: "[Mother] admits to causing the injuries to [J.J.V.] but offers an inconsistent and unbelievable explanation of the injuries, as well as blanket denials of any problems whatsoever." *Id*. at 7. As a result of her observations, Dr. Valliere concluded that "[Mother] cannot be considered a caretaker for [the Children]. She is at risk of harming children in her care. Her parental capacity is severely compromised." *Id.* at 9. While Dr. Valliere concluded that Mother's prognosis was "poor," she recommended that Mother begin "long-term" psychiatric treatment. *Id*.

Parents' contact with the Children never progressed to unsupervised visits and steadily declined in frequency. *See* N.T., 1/15/25, at 168, 196-97. Father's visits have been consistently supervised by the Agency. *See id*. at 196-97. In April 2023, the Agency became concerned Mother's family could not effectively ensure the Children's safety, and assumed supervision of Mother's visits. *Id*. at 169. Mother has not visited J.J.V. since May 2023 due to the entry of an aggravated circumstances order. *See id*. at 179. For the same reason, Mother has also never been permitted visitations with Y.A.B.K. *See* N.T., 11/15/24, at 125.

In February 2024, the juvenile court changed the primary permanency goals for T.J.A., J.J.A., J.L.S., J.T.S., and J.J.V. to adoption with a concurrent goal of permanent legal custody. *See* N.T., 11/12/24, at 140; N.T., 11/15/24, at 5. In June 2024, the juvenile court similarly changed the primary permanency goals for Y.A.B.K. *See* N.T., 11/12/24, at 144; N.T., 11/15/24, at 5. Neither Parent appealed these orders.

On April 24, 2024, the Agency filed separate petitions collectively seeking to involuntarily terminate Parents' parental rights to all of the Children except for Y.A.B.K. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[5] On July 17, 2024, the Agency filed a similar petition with respect to

_____

[5] Pennsylvania law mandates the appointment of separate counsel to represent children's legal interests in contested involuntary termination of parental rights proceedings. *See In re Adoption of L.B.M.*, 161 A.3d 172,
*(Footnote Continued Next Page)*

174 (Pa. 2017); 23 Pa.C.S.A. § 2313(a).  Our Supreme Court has instructed this Court to conduct limited *sua sponte* review to confirm that counsel is appropriately appointed for such children.  **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020).  We are thus empowered to review:  (1) if the Orphans' Court appointed counsel to represent a child's "legal interests" as required by 23 Pa.C.S.A. § 2313(a); and (2) where a dual legal interest counsel and guardian *ad litem* is appointed to solely represent both the child's legal and best interests, whether the Orphans' Court "determined that those interests did not conflict."  **Id**.

   With respect to T.J.A., J.J.A., J.L.S., J.T.S., and J.J.V., the Orphans' Court entered orders in May 2024, appointing Timothy J. Barton, Esquire, to serve as legal interest counsel, and separately directed Emily Ward, Esquire, to serve as guardian *ad litem* for the children and represent their best interests.  **See** Order, 5/23/24, at 1 (unpaginated).  Accordingly, we observe no structural error with respect to section 2313 in those cases.

   Y.A.B.K. was represented solely by Attorney Ward, who served as his guardian *ad litem* and represented both his best and legal interests.  **See** Order, 8/13/24, at 1 (unpaginated).  Y.A.B.K. was only one year old during these proceedings and Attorney Ward explained that he was not capable of directing representation by expressing his objectives.  Motion for Appointment of Counsel, 7/24/24, at ¶ 8.  Our precedent provides that, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests."  **In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018).  Under such circumstances, the mandate of section 2313(a) is satisfied where the court "has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings."  **Id**.  Thus, we also discern no structural error with respect to counsel in Y.A.B.K.'s case.

   We note with concern, however, the Orphans' Court's initial orders respecting the appointment of counsel inappropriately delegated to counsel the court's responsibility to determine if a conflict existed between the Children's best and legal interests.  **See** Preliminary Order, 9/12/24, at 1 (unpaginated) ("Per established protocols, the Office of the Guardian *Ad Litem* shall file a [m]otion addressing whether or not a conflict exists in their representation of the best interests of the child versus the legal interests of the child."); Preliminary Orders, 5/6/24, at 1 (unpaginated) (same).  This Court has explicitly rejected such an abdication of the Orphans' Court's obligation to render an independent determination regarding potential
*(Footnote Continued Next Page)*

- 14 -

Y.A.B.K. The Orphans' Court held hearings on these petitions on November 12 and 15, 2024, and on January 15-16, February 20-21, and March 17 and 19, 2025. At the time of these proceedings, the Children ranged in age from less than two years old to seven years old. Y.A.B.K. had been in placement for approximately twenty-two months; the rest of the Children had been in placement for approximately thirty months.

Parents were each present at the hearings and represented by counsel. Mother testified on her own behalf and also presented testimony from Maternal Grandmother and Maternal Aunt. Father did not testify.

On June 26, 2025, the Orphans' Court issued decrees that denied the Agency's petitions. Specifically, the court concluded that grounds for termination "pursuant to [section] 2511(a) of the Adoption Act ["the Act"] have not been established by clear and convincing evidence[.]" Decrees, 6/26/25. On July 24, 2025, the Agency timely filed separate notices of appeal at each of the above-captioned cases along with concise statements of error complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On August 11, 2025, this Court consolidated these cases for disposition *sua*

_____

conflicts of interest **before** counsel is appointed. **See Matter of Adoption of A.C.M.**, 333 A.3d 704, 708-09 (Pa. Super. 2025) (citing **K.M.G.**, 240 A.3d at 1236). Indeed, it was only through the prompt action of Attorney Ward in filing motions for the appointment of separate counsel the Orphans' Court avoided structural error.

*sponte*. ***See*** Pa.R.A.P. 513. On August 15, 2025, the Orphans' Court submitted a Rule 1925 opinion.

The Agency has raised the following issues for our consideration:

1.    Did the [Orphans' C]ourt abuse its discretion and err as a matter of law in failing to grant [the Agency's] petition for involuntary termination of parental rights with respect to [Parents] under 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8) where clear and convincing evidence was presented and such denial was not supported by the record?

2.    Did the [Orphans' C]ourt abuse its discretion and err as a matter of law in failing to grant [the Agency's] petition for involuntary termination of parental rights of [Parents], under 23 Pa.C.S.A. § 2511(b) where clear and convincing evidence was presented and such denial was not supported by the record?

CYS Brief at 4 (underlining removed; unnecessary capitalization eliminated).[6]

The Agency's petitions sought termination of Parents' parental rights pursuant to section 2511(a)(1), (2), (5), and (8). It asserts the Orphans' Court "misapplied the proper legal framework" in analyzing section 2511(a)(5) and (8). ***See*** CYS Brief at 55.

_____

[6] In this Court, Attorney Ward has filed a brief in her capacity as guardian *ad litem* for the Children advocating reversal of the Orphans' Court's decrees. Attorney Ward similarly advocated in favor of terminating Parents' parental rights at the underlying termination hearings. ***See*** N.T., 3/19/25, at 113 (Attorney Ward states the Children's "best interest would be served by granting the [A]gency's petitions and letting [the Children] move forward with the permanency that they deserve, the stability, and the safety."). Attorney Barton has not filed a brief in this Court in his capacity as legal interest counsel. We discern this may be related to the argument he presented in the underlying proceedings, wherein he concluded that none of the Children could articulate a clear preference with respect to the termination of Parents' parental rights. ***See*** N.T., 3/19/25, at 97.

Our standard and scope of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted, brackets removed).

The involuntary termination of parental rights is governed by section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). We

- 17 -

emphasize that each subsection under section 2511(a) is "distinct" and requires its own, separate legal analysis. Furthermore, the elements of each subsection are distinct. **G.W.**, 342 A.3d at 83 (citing **In re K.R.**, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*)). If the Orphans' Court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

Section 2511 provides, in pertinent part, as follows:

### § 2511.  Grounds for involuntary termination

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an

agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * * * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a) . . . (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(5), (8), (b).

This Court has explicitly noted the grounds for termination under Section

2511(a) are not interchangeable and a court errs by applying language in one

subsection to another:

We recognize that factual matters under the Adoption Act do not always neatly fit into legal boxes, but our Supreme Court has emphasized time and again that we must hew closely to the statutory language. *See*, *e.g.*, *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (analyzing the "pivotal language" of the statute); *In re Adoption of S.P.*, 47 A.3d 817, 827-28 (Pa. 2012) (cautioning this Court to avoid "improperly quoting" caselaw applying a different subsection because the statutory grounds are distinct and cannot be conflated). The grounds are not interchangeable and a court errs by indiscriminately applying case law analyzing one subsection to another. *See S.P.*, 47 A.3d at 827-28 (holding the Orphans' Court erred by applying caselaw analyzing the (a)(1) abandonment subsection to the (a)(2) incapacity subsection); *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2003) (holding the Orphans' Court erred by "improperly conflating

- 19 -

the statutory requirements of subsections (a)(2) and (a)(5) with those of subsection (a)(8)").

***G.W.***, 342 A.3d at 85-86 (citations modified).

The grounds for termination under section 2511(a)(5) and (8) are distinct. ***See id***. Section 2511(a)(5) contains five separate elements: (1) the child has been removed from parental care either by the court or under a voluntary agreement for at least six months; (2) the conditions that led to the child's removal or placement continue to exist; (3) the parent(s) cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services or assistance reasonably available to the parent(s) are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. ***See In re B.C.***, 36 A.3d 601, 607 (Pa. Super. 2012). By contrast, section 2511(a)(8) requires proof of three elements: (1) the child has been removed from the parent's care either by the court or under a voluntary agreement for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. ***See In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa. Super. 2018). Moreover, termination under subsection (a)(8) does not require an evaluation of a parent's ability or willingness to remedy the condition that led to placement. ***See id***.

In its Opinion, the Orphans' Court conflated the provisions of Section 2511(a)(5) and (8), as follows:

> **Under 23 Pa.C.S.[A.] § 2511(a)(5) and (a)(8),** the Agency had the burden of proving by clear and convincing evidence that the "conditions which led to the removal or placement of the child continue to exist, **the parent cannot or will not remedy those conditions within a reasonable period of time**, the services or assistance reasonabl[y] available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child." **See** 23 Pa.C.S. § 2511(a)(5) and § 2511(a)(8).

Orphans' Court Opinion, 8/15/25, at 13-14 (emphasis added). Plainly, the Orphans' Court treated the requirements of Section 2511(a)(5) and (8) as interchangeable or coextensive, and incorporated elements required only under (a)(5) into (a)(8). This was legal error. **See G.W.**, 342 A.3d at 85-86; **J.N.M.**, 177 A.3d at 943; **I.J.**, 972 A.2d at 11.

The Orphans' Court's legal error significantly impacted its findings. Subsection (a)(5) permits the court to assess whether the parent can or will remedy the conditions that lead to removal within a reasonable period of time; by contrast, subsection (a)(8) requires the court simply to determine whether the conditions that led to removal continue to exist. **Compare** 23 Pa.C.S.A. § 2511(a)(5) with 23 Pa.C.S.A. § 2511(a)(8). The trial court's Opinion clearly conflates the two sub-sections when it quotes the language of (a)(5) and represents through its citation that it is also the language used in subsection (a)(8). **See** Orphans' Court Opinion, 8/15/25, at 13-14. A plain reading of both subsections shows that the elements of each subsection are not

interchangeable and require distinct legal analysis. *See supra.* at 17-18. It is also clear from the language of the opinion that the trial court only applied the (a)(5) standard. For example, the trial court concluded that the efforts of the parents were "bearing fruit", which is relevant only to a ***subsection (a)(5)*** analysis. *See* Orphans' Court Opinion, 8/15/25, at 20.

A parent's efforts to correct the conditions that led to placement more than twelve months after placement are irrelevant under subsection 2511(a)(8):

> By its plain language, ***subsection (a)(8) does not require evaluating a parent's willingness or ability to remedy the conditions that initially caused placement, nor does it require an evaluation of the availability or efficacy of CYS services.*** Stated another way, pursuant to section 2511(a)(8), when one year has elapsed from the children's removal, the General Assembly has relieved the petitioner from the burden of providing that the parent is incapable of, or unwilling to, remedy the conditions, circumstances, or conduct that led to the children's removal. ***This is unique to a subsection (a)(8) analysis.*** The court's inquiry is no longer concerned with whether the parent is capable of change, or whether the parent has tried to change, but seeks only to discern if the parent has, in fact, changed.
>
> Indeed, ***a parent's progress toward remedying the conditions is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of subsection (a)(8).***

***G.W.***, 342 A.3d at 87 (internal citations and quotation marks omitted, footnote omitted, emphases added). This Court has acknowledged the result "may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children." ***I.J.***, 972 A.2d at 11. However, we have simultaneously recognized "a child's life cannot

be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities" and we "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time . . . to **complete** the process of either reunification or adoption for a child who has been placed in foster care." **I.J.**, 972 A.2d at 11-12 (citation and internal quotation marks omitted, emphasis in original).

Accordingly, the Orphans' Court's discussion of Parents' asserted efforts towards reunification was irrelevant to the subsection (a)(8) analysis; the appropriate inquiry with respect to the second element of that subsection is whether the conditions that led to the Children's removal have been remedied such that reunification was "imminent" at the time of the termination hearings; mere evidence of progress, alone, is legally insufficient. **G.W.**, 342 A.3d at 87. As a result of its erroneous focus, the Orphans' Court did not determine whether Parents have remedied the conditions that led to the Children's removal pursuant to section 2511(a)(8), requiring the vacating of its decrees.

The Orphans' Court states it found two conditions led to the Children's removal: J.J.V.'s injuries at Mother's hands and the deplorable conditions of

the family's home. *See* Orphans' Court Opinion, 8/15/25, at 16.[7] It further concluded the Agency did not produce "clear and convincing evidence [Mother's] mental health concerns were the reason that [the Children] were placed in the care of the Agency." *Id*. at 21. The court also noted that the record was "devoid of any evidence relating to the exact cause of the injuries to J.J.V.[]" *Id*. at 15. The record belies this conclusion.

"[D]etermining whether the conditions that led to the removal remain is less of a hyper technical task than it is a commonsense consideration of whether the conditions continue to stand in the way of reunification." *G.W.*, 342 A.3d at 87. The medical testimony CYS presented showed Mother was in denial that she had caused J.J.Y.'s injuries and Father was unable to protect the Children. As detailed above, the physicians treating J.J.V. determined in October 2022 that the horrific burns she suffered in Mother's care were the result of a nonaccidental ingestion of an unknown caustic chemical. CYS Exhibit 15 at 57, 618-19, 647, 654, 837, 966, 1148. The Agency's ongoing safety concerns are directly related to the failure of Parents, and particularly Mother, to provide a reasonable explanation for J.J.V.'s injuries and Mother's continued denial that she does not know how the injuries were caused. *See*

_____

[7] We note again that CYS's failure to include the dependency record in the certified record or any testimony indicating the exact conditions that led to removal prevents us from determining whether the trial court found any other grounds for removal or placement.

N.T., 11/15/24, at 19 (CYS caseworker Kelli Myers-Gottemoller's testimony, "we were told how the injury happened, and it wasn't a hot bottle.").

On this record, absent findings from the Orphans' Court, we cannot properly assess the subsection (a)(8) analysis.[8]  In this context, "our standard of review does not permit us to make factual findings from the cold record without the benefit of the orphans' court's longitudinal knowledge and firsthand credibility determinations."  **G.W.**, 342 A.3d at 93.

We acknowledge the Orphans' Court set forth a truncated analysis of section 2511(b) in its Opinion concluding that there was a "beneficial and strong bond between Mother and Father and the [C]hildren."  Orphans' Court Opinion, 8/15/25, at 30.  We note, however, "[a]n emotional bond with a parent is legally insufficient to preclude termination of parental rights without determining whether such bond is necessary and beneficial to the child **and weighing the other factors present in the record.**"  **G.W.**, 342 A.3d at 91 (emphasis added) (citing **K.T.**, 296 A.3d at 1114-15).  Due to the legal error of conflating subsections (a)(5) and (8) and the incomplete list of the initial conditions of removal, we cannot rely upon these purported findings in place of a proper analysis of the Children's needs and welfare as required by section

_____

[8] The only relevant findings the Orphans' Court issued with respect to section 2511(a)(8) related to Parents' arguable efforts towards reunification. However, "[a] parent's efforts and some progress towards reunification is irrelevant to, and cannot form the basis of, a needs and welfare analysis under subsection (a)(8)."  **G.W.**, 342 A.3d at 91.

2511(a)(8) and (b). Furthermore, we note that Pennsylvania law requires that the needs and welfare analysis mandated by section 2511(a)(8) take place **before** a court begins consideration of section 2511(b). **See In re C.L.G.**, 956 A.2d 999, 1009 (Pa. Super. 2008) ("[W]e are required to resolve the analysis relative to [s]ection 2511(a)(8), prior to addressing the 'needs and welfare' . . . proscribed by [s]ection 2511(b); as such, they are distinct in that we must address [s]ection 2511(a) before reaching [s]ection 2511(b).").

Because the Orphans' Court below conflated the elements of subsections (a)(5) and (a)(8), and because that conflation is substantive to the legal analysis, an error of law occurred that requires us to vacate the decrees denying the Agency's termination petitions and remand for the Orphans' Court to promptly conduct a separate and comprehensive legal analysis of section 2511(a)(8) applying the proper legal standards and, if it concludes that grounds for termination do exist under (a)(8), to conduct a legal analysis of section 2511(b).[9] **See**, **e.g.**, **G.W.**, 342 A.3d at 93-94; **I.J.**, 972 A.2d at 13.

Decrees vacated. Case remanded with instructions. Jurisdiction relinquished.

_____

[9] Given the nature of our holding, we need not address the remainder of the Agency's claims for relief pursuant to section 2511(a)(1), (2), (5), or (b).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/12/2026